IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARCELA S. SANTOS | ) | |
| aka D.L. SANTOS | ) | |
| 305 Farragut Avenue | ) | |
| Rockville, Maryland 20851 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-334 |
| | ) | |
| THE TRUSTEES OF GRINNELL COLLEGE | ) | JURY DEMAND |
| dba GRINNELL COLLEGE | ) | |
| 733 Broad St | ) | |
| Grinnell, Iowa 50112 | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff MARCELA S. SANTOS, also known as D. L. SANTOS, through her attorney,

brings this action against Defendant THE TRUSTEES OF GRINNELL COLLEGE, doing

business as GRINNELL COLLEGE, and alleges the following:

### *THE PARTIES*

1.  Plaintiff MARCELA S. SANTOS, also known as D.L. SANTOS ("D.L."), is a

twenty-two -year-old citizen and resident of Maryland.

2.  Defendant THE TRUSTEES OF GRINNELL COLLEGE, doing business as

GRINNELL COLLEGE ("Grinnell" or "the College"), a citizen of Iowa, is an Iowa nonprofit

corporation whose principal place of business is in Grinnell, Iowa.

### *JURISDICTION AND VENUE*
### *Subject Matter Jurisdiction*

3.  This Court has the power to hear and decide Plaintiff's claim in the First Cause of

Action pursuant to 28 U.S.C.A. §§ 1331 and 1334(c)(4).  The claim, which asserts violations of

Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.A. § 794, arises under a

law of the United States and seeks to recover damages under an Act of Congress providing for the protection of civil rights.

4. This Court has the power to hear and decide Plaintiff's claims in the Second through Seventh Causes of Action pursuant to 28 U.S.C.A. § 1332(a). The matter in controversy in respect of each claim exceeds the sum of $75,000 and there is complete diversity of citizenship between Plaintiff and the Defendant.

### *Personal Jurisdiction*

5. This Court may exercise general jurisdiction over Defendant Grinnell. The College has a continuing presence in this forum that is integrally related to its principal educational function and, in addition, it regularly and continuously carries on decision-making activities in the District of Columbia pertaining to college admissions.

6. For decades, Grinnell faculty and degree-seeking Grinnell students have spent their fall semester in Washington, D.C. The College's 16 semester credit Grinnell-in-Washington program is an integral arm of the College campus which combines several undergraduate courses taught by full-time Grinnell faculty with internships at Washington-based organizations. Participation in the program satisfies the College's residence requirement, which mandates that Grinnell students must have taken a minimum number of semesters of full-time courses in residence on the College campus.

7. The College also maintains a systematic and continuous pattern of regular business activity in the District of Columbia, apart from casual contacts typical of local college recruiting. For the last eight years, at least, the College's admissions office has been present in this District. Every fall when it deploys admissions officers and senior administrators to Washington to carry on the essential functions of college admissions unrelated to recruiting. While in this forum, the team of college officials interviews twenty to twenty-five students selected by the Washington,

D.C. office of the Posse Foundation, evaluates the students and their applications for admission, chooses which students will be admitted as Posse Scholars and phones each of them to extend binding offers of early admission.

### Venue

8.   Venue in this Court is proper.  Grinnell is a D.C. resident, as its permanent presence and extensive other contacts with this forum subject it to personal service here.

### FACTS

### I. D.L.'s Disability Substantially Limits Major Life Activities

9.   In January 2009, D.L. was a freshman at Grinnell.  Her therapists[1] informed the College they had diagnosed she had bipolar disorder.  Its episodic symptoms substantially limited major life activities by, among other things, distorting her perception of reality and interfering with critical functions, including reasoning, concentration, judgment, comprehension, communication and interactions with professors and administrators.  They recommended the College provide D.L., as an accommodation, written feedback from professors about her class attendance, assignments, participation and grades to mitigate the effects of her impairment's cycles.

### II. Until Grinnell, D.L. Had Successfully Used Informal Measures to Mitigate Limitations

### A. D.L. Had Been Assured Grinnell's Posse Mentor Program Would Not Require Her to Request ADA Accommodations

10. D.L. was a Posse Scholar.

11. The Posse Foundation ("Posse")[2] recruits and evaluates students with academic and leadership potential who might not qualify for admission to a top-tier college like Grinnell solely on

---

[1] Unless otherwise stated, the term "therapist" refers to any licensed mental health practitioners.  Therapists include psychiatrists (*i.e., medical* doctors specializing in psychiatry) and psychotherapists (licensed *non-medical* mental health practitioners, including psychologists and mental health counselors such as psychiatric nurses and social workers).

[2] The Posse Foundation, Inc. is a New York not-for-profit corporation with an office in Washington, D.C., whose principal place of business is in New York City.

the basis of her grades and standardized test scores.

12. Posse recommended approximately twenty-five candidates, including D.L., to Grinnell. The College admitted eleven of them, including D.L., on a four year, full tuition leadership merit scholarship.

13. Each cohort of students sent to a Grinnell and other Posse partner college is called a Posse.  Members of a Posse are known as Posse Scholars.  Colleges like Grinnell benefit from this arrangement because Posse Scholars advance the goal of diversifying the colleges' student bodies.

14. The main feature of Posse's program is the on-campus mentor.  The mentor is an individual through whom Posse fulfills its goals "to ensure that Posse Scholars persist in their academic studies and graduate" and its promise to Posse Scholars like D.L. that it would provide "an on-campus mentor to track their progress."

15. Generally, Posse mentors are subsidized by Posse's partner colleges.  They may be a full-time employee of the College.  D.L.'s Posse mentor at Grinnell was Judy Hunter, a full-time employee of the College.

16. Grinnell, through Elena Bernal, Vice President for Diversity and Achievement, and Posse, through Marcy Mistrett, Posse's Washington, D.C. Director, led D.L. to believe the mentor program would function in substantially similar fashion as the informal support networks of parents, teachers and administrators she used in middle school and high school.  With medications, psychotherapy and her support network, D.L. had successfully mitigated her mental impairment's effect on her education.

17. Informal support allowed D.L. to forgo reliance on formal accommodations and modifications under Section 504 and the Americans with Disabilities Act ("ADA").  ADA/504 accommodations were disfavored.  They are often misperceived as special favors in the case of hidden disabilities like D.L.'s.  D.L.'s informal networks had an advantage.  They avoided

stigma and encouraged independence by focusing on developing coping skills.  They were enough for D.L. to function as a student.

18. Even before she applied to Posse and Grinnell, D.L., through her parents, had explained to them that her disability would at times cause her to lose sight of how she was doing at school.  They assured D.L., who was a minor at the time, and her parents that the mentor would be her active guide and supporter at college.  Helping D.L. keep track of her academic progress was one of the mentor's principal functions.

19.  It was therefore troubling for D.L. to discover near the end of her first semester that her mentor did nothing of the sort.

## B.  D.L. Functioned Well as a Student Before and After Grinnell

20. D.L.'s freshman first semester was a disaster.  She failed every course without anyone noticing.  When her academic problems were discovered, it was too late in the semester to take effective remedial measures.  Her mentor sent her to Joyce Stern, Dean of Academic Advising.  Stern emailed professors that adverse side effects to new medications prescribed by her D.L.'s psychiatrist were a prime contributing factor in her academic failure.  By finals week, Stern convinced D.L. to take an emergency medical leave of absence.  She told D.L. to go home and not return until the following academic year.

21. But for her medical leave, D.L.'s college transcript would have shown she failed all her classes.  The medical leave wiped the slate clean.  Her transcript now indicates she had, instead, withdrawn from all her courses without a grade.  This was small consolation.  Considering she had withdrawn in finals week, she had nothing to show for her time there.  D.L. was devastated.  Her Posse network had failed her.  She had demonstrated she functioned well in college-level courses before Grinnell, and she would move on elsewhere to demonstrate it again.  But this gaping hole existed in her academic record.

22. D.L.'s capacity to function as a student in spite of her disability was reflected in her secondary school record.   Her SAT and ACT scores placed her solidly between the 91st and 97th percentile nationally, at or above the median of Grinnell entering classes.   Her designation as an Advance Placement Scholar and two semesters of college-level credits (the equivalent of seven college courses in Advance Placement and International Baccalaureate subjects) situated her among fewer than 15% of any Grinnell entering class.

23. Her weighted GPA exceeded 4.0 after seven years in the highly selective Montgomery County (Maryland) School District's magnet programs.   The programs only admit 100 students annually from throughout the county.   D.L.'s most prized personal achievement was her Gold Award.   The award, which only 5% of eligible Girl Scouts earn nationally, is the counterpart to the Eagle Award in Boys Scouts.   It was the culmination of ten years of service in Girl Scouts.

24. However, a recommendation letter from her high school counselor adds contrast to this picture.   He wrote that D.L.'s most remarkable achievement was that she overcame her disability in a high stress academic setting – an International Baccalaureate program which even talented unimpaired students found daunting.   He confessed predicting in her ninth grade that D.L.'s disability would thwart her progress in the county's nationally-ranked International Baccalaureate program.   He wrote admiringly that, by her senior year, D.L. had disproved him. He acknowledged she succeed with support from a network of her parents, teachers and administrators who informally accommodated her disability.   But he stressed that, to D.L.'s credit, her accomplishments were all her own.

25. D.L.'s secondary school academic success and extracurricular activities explain why she was accepted to Grinnell; in turn, her disability and her accumulated triumphs in spite of its limiting effects explain her connection to Posse.

26. Grinnell is a selective, nationally ranked small liberal arts college whose peers include

Amherst, Bowdoin, Carleton, Macalester, Oberlin, Pomona and Swarthmore.  D.L. was, by any measure, a viable candidate for any of them.

27. Posse recruits disadvantaged students with "extraordinary academic and leadership *potential."*  D.L. was disadvantaged by her disability, but she had extraordinary academic and leadership potential and a record of success against the odds to prove it.

28. D.L. chose the combination of Posse and Grinnell.  Conversely, they chose her combination of academic success in spite of her disability.

29. The three-way relationship was contractual as well as symbiotic.  In relevant part, D.L. promised to participate in all Posse functions for several years and to apply for early admission to Grinnell, and Posse promised to provide her an on-campus mentor to help track her progress.   To Grinnell, she promised to attend if admitted, and Grinnell promised her the liberal arts college education she coveted and a four year, full tuition merit scholarship.

30. When Grinnell admitted D.L, she rejected several college offers, withdrew pending applications and refrained from applying to any more colleges.

31. Before starting, the President's Office, the Admissions Office, the Housing Office and the Health Center were all informed about her disability.  As an added precaution in case of emergency, D.L. filed unsolicited confidentiality waivers in the Health Center records and with her new Iowa therapists.  The waiver was intended to allow the College to secure medical and mental health information about her in an emergency.

32. Yet, D.L.'s best laid plans went awry.  The Posse mentor was stillborn.  Her first semester was a washout.

33. Now her focus was on figuring out why her academic progress stalled.  Her Posse mentor had been clueless about her academic progress, and D.L. was herself, as Stern acknowledged, in a disoriented mental state due to side effect of medication prescribed by her psychiatrist.

34. Significantly, D.L. had never flunked a course before.  (And she would never again flunk one.)

### III. Grinnell Resists D.L.'s Re-Admission; Consents Upon Mutual Exchange of Assurances

35. Back in Maryland by Christmas 2008, D.L. eschewed Stern's mandate to stay out because of her disability.  She consulted with her therapists.  After proper examination and consideration, they agreed that D.L. was fit to return and prepared reports to inform Grinnell.

36. D.L. and her two treating Maryland therapists next turned to devising a plan to insure success at the College.  D.L. observed her mentor had no information to help her track academic progress.  Reasoning that students can ask professors about their course work, D.L. and her team decided that she, as the student, was entitled to ask four basic questions: Have I been attending class? Participating in class?  Turning in my assignments?  Are my grades on the decline?

37. However, in their view, the answer had to be in writing and delivered to a third party. This was the most effective way for D.L. to process information about her academic progress. Written information collected by a trusted intermediary allowed her to review her academic progress without stressful interaction with professors.  Information about lapses in her performance as a student directed to her without a mediating filter was unreliable. Her disability limited her capacity to comprehend the information and take appropriate corrective action.

38. Written information leveled the playing field.  Where unimpaired classmates had the capacity to communicate and interact with professors in person, she would gain access in writing.

39. Three more therapists, Posse and her parents saw D.L.'s plan and found it appropriate.

40. On January 13, 2009, D.L. requested re-admission and submitted her plan to show her seriousness of purpose.

41. Grinnell written policy on re-admission for students on emergency medical leave

provided that "medical documentation from a physician, psychiatrist, or other licensed medical professional, who has been treating you during your leave of absence. . . . should clearly state that you are ready to enroll in a full academic course load (12-16 credits) and it should identify your current condition and the current impact of the condition on your ability to do work and live in the residence halls."

42. Stern, however, had pre-judged the matter and raised the bar.  She said D.L. had less than a 50/50 chance of gaining re-admission.  D.L. was still required to document her therapists' conclusions about her fitness to resume a full course load, her stable condition and her ability to work and live on campus.  She was now instructed to make an "unusually strong case" for return and show she had a "significantly changed situation."

43. With the new semester upon her, D.L. gathered her two therapists' letters, added a third one from a non-treating psychiatrist, and made her case in a letter focused on Stern's higher threshold.  She adhered to Stern's admonition that a Grinnell student can steer her own ship.  She took full responsibility for the success or failure of her plan, but she sought assurances that the College would support her plan.

44. Her readmission request letter acknowledged there were barriers in her way that she needed to overcome on her return.  She asked help from Grinnell in employing tools it had available "to overcome those barriers on my own. . . . I know it is best that I have a system in place to prevent" a recurrence of the last semester.  Her plan listed several services the College provided.  She said, "These are all things that Academic Advising already offers. . . . At this time, I. . . need help developing serious habits to help me work through the limitations that my bipolar disorder imposes on me. . . . I'd like to work with Academic Advising to help develop these tools. . . . Academic Advising can help me gain confidence in managing my academic work and improve my self-advocacy skills. . . ."  D.L.'s letter concluded, "It's through your support and encouragement to make

9

my own decisions that I'm sticking to my intuition" that "it's time for me to steer my own ship."

45. Stern received D.L.'s re-admission petition and solicited two more opinions.  She phoned D.L.'s Iowa treating psychotherapist and psychiatrist, "who both support your return to campus."   Five therapists in total favored her return.

46. Stern replied on January 15, 2009 that the College did not concur with her parents and her five therapists.  The College felt it was too soon for D.L. to return.  "However, on the basis of the information from your doctors, and our understanding that you and your family believe you are medically able to resume your education at Grinnell, we have agreed you may enroll for the Spring 2009 semester with the expectations described below."

47. With one exception, the listed expectations pertained to D.L.'s plan.  Clearly, the College, too, wanted reassurances from D.L.

48. The letter concluded that "[i]f you are willing to adhere to the expectations[,] you can re-enroll."

49. D.L. willingly committed.  The College endorsed her plan and promised it stood ready to support her plan and would partner with her as she implemented it.  "We stand ready to support you in this elaborate and thoughtful plan you have written, but want to remind you that at the end of the day it's your plan. . . . We will partner with you. . . ."

50. D.L. was optimistic she could implement the plan herself to demonstrate her capabilities, as long as she had a commitment or assurance that no one would stand in her way and undermine her plan.

### IV. D.L. Seeks Accommodations; Grinnell Strings Her Along for Six Weeks

## A.  D.L.'s Basic Accommodation Request – Four Questions

51. D.L. met with Stern on her return.  Stern said she was apprehensive about D.L. asking professors to send the answers to her mentor and suggested it was D.L.'s responsibility as a

10

student to stay on top of her work.

52. D.L. was alarmed that Stern was already regretting its promise to support and partner with her in the implementation of her plan.

53. As a result, on January 26, 2009 she opted to ensure the key elements of her plan were preserved by asking for ADA/504 accommodations. Her principal request is a virtual restatement of her plan's Four Questions:

> Assistive Communications Support (Accommodation No. 1): I ask that frequent, timely and concrete information about me be conveyed to Judy Hunter, my Posse mentor, by my professors, academic advisor and my Academic Advising counselor(s).
>
> I. Professors: In order for this accommodation to be effective, my professors must give Judy timely bi-weekly answers to the following four questions:
> a. How many classes I have missed and did I follow-up with the professor on my return to class?
> b. What papers have I turned in late or not at all?
> c. What is my level of class participation?
> d. Have there been any changes in the trend of my grades since the last report?

54. This request had three components: (a) Concrete responses[3] (b) provided every two weeks (in effect, six to seven times over the 15 weeks) (c) and delivered on time semester.

55. The responses were to be delivered to D.L.'s Posse mentor. The mentor was to discuss the responses with D.L. and would coach her accordingly. The Posse mentor was already an agent of Posse who fulfilled Posse's promise to D.L.

56. Nothing prevented the mentor from receiving the information: Posse Scholars execute a Family Educational Rights and Privacy Act (FERPA) Release entitling Posse and its mentor to receive the Scholars' grades and other academic information. Posse, through Marcy Mistrett, its D.C. Director, agreed that the plan would be the means by which Posse would fulfill its promise to provide a mentor to track her progress. Grinnell knew Posse's promise was contractual, and Mistrett

---

[3] For instance, a hypothetical email response might read as follows: "Yes, you missed Monday's class, unexcused; your draft outline on *Death in Venice* was due last Friday, it'll drop you one grade on your final paper next week; participate more inc class discussions; no grades, too early in semester."

informed Grinnell, through Stern, Houston Dougharty, Vice President for Student Affairs, and/or Elena Bernal, Vice President for Diversity and Achievement, that Posse supported D.L.'s plan for getting the information to her mentor.

57. Nonetheless, Grinnell, through Stern, told D.L. that the Posse mentor would not be handling D.L.'s responses.  The mentor followed up to say she preferred not to receive the information.  D.L. had no time to quibble.  She proposed others, but Grinnell balked.  Grinnell did not want any of its people be involved.  As a result, D.L. was compelled to she she would collect the answers herself.

58. This went against what her therapists told Stern.  Written communication collected by her Posse mentor or other central point of contact was the most effective way for D.L. to grasp information about her academic progress.  Still, Grinnell, through Stern, took six weeks to unequivocally and unambiguously reject the accommodation at a March 12, 2009 meeting with D.L. and her parents.  The basis for the College's final determination was that the law did not require professors to answer her questions in writing.

**B.  Grinnell Drags Out Discussions**

59. Over those six weeks, it seemed Grinnell was willing to discuss ways to arrange the accommodation.  The March 12 meeting exposed a subterfuge.  Grinnell had, in fact, used the time as a stratagem to grind D.L. down, hoping she would withdraw her request or otherwise trip up.

60. Stern's correspondence and statements indicated that Houston Dougharty, Vice President for Student Affairs, and Paula Smith, Vice President for Academic Affairs and Dean of the College, initiated, encouraged, facilitated and endorsed Grinnell's dealings with D.L. in connection with all matters arising from or related to her accommodation request and her academic progress during the semester.

61. Indeed, by February 17, 2009, D.L. had already been ground down by Grinnell's

delays.  She enlisted her mother's help.  Frustrated in her own efforts, D.L.'s mother stripped the accommodation request to its core.  On March 3, 2009, thirty-six days after D.L.'s initial accommodation request, she asked that Grinnell send timely concrete written answers to D.L.'s Four Questions directly to D.L. directly every two weeks.  Her correspondence went unanswered.  Then a serious incident occurred to D.L. which required here parents to rush to her side.

62. Once they were all there, Grinnell, through Stern, would reject the final request on March 12, 2009 in a face-to-face meeting with D.L. and her parents, forty-five days after the initial accommodation request.

63. D.L. and her parents had misread Grinnell.  Its first response to D.L.'s original request would yield something other than an outright rejection six weeks later.

*1. Grinnell's Alternate Accommodation Offer is of Inadequate Quality and Effectiveness*

64. The College's first response to her accommodation request on January 30, 2009 acknowledged that D.L. is "a person with a disability, as defined by our various civil rights laws, and you are thus entitled to reasonable accommodations at the college level, consistent with your limitations, in order to provide full and equal access to the programs and services at Grinnell."

65. However, in lieu of D.L.'s Four Questions, the College offered to "prompt" professors every three weeks to report whether D.L. was having any "academic difficulty."  Stern would collect the answers, if any, and would decide whether any part would be shared with D.L., her mentor or her therapist.

66. D.L. was not enamored of the alternate accommodation, but she asked her psychiatrist to review it.  In the meantime, she investigated it further.  What she heard was not to her liking.  She had reason to believe Grinnell's alternate accommodation was a sham.  It seemed possible that the College already "prompted" professors every three weeks for a so-called Academic Difficulty

Report.

67. But as D.L. had no way of confirming this, she replied on February 17, 2009, by including her Maryland psychiatrist's report stating that the alternate accommodation was of inadequate quality and effectiveness.  Non-mandatory "prompts" for an academic difficulty report was an illusory accommodation.  A three-week cycle did not give D.L. time to take corrective action before an academic crisis developed.  The proposed academic report was too haphazard to be effective; D.L.'s Four Questions elicited short and uniform facts which could be correlated over time and at discrete intervals. Editing, redacting or withholding answers addressed censored academic progress information that D.L. was entitled to receive as a student.  Grinnell, through Stern, was told time and time again that D.L's Four Question were innocuous and not burdensome.  They asked for information about her academic progress that unimpaired students could ask in person and could reasonably expect to have answered.

68. D.L. also asserted that the Academic Difficulty Report system was already used by Grinnell.[4]

*2.  Informal Discussion are Fruitless*

69. Informal, interactive discussions followed. D.L. informed Stern that her mother would manage the ADA/504 discussions with the College.  D.L.'s mother was on the phone with Stern on February 20, 2009 and thought she ironed out an acceptable arrangement.  But, after the weekend, she sent a confirming email, dated February 24, 2009, which caused Stern to change her mind.

70. In a letter dated February 27, 2009 but emailed on March 2, 2009, Stern said she had concerns and wanted to show how re-working D.L.'s proposed accommodation request could

---

[4] The College neither denied nor confirmed this until its letter dated February 27, 2009, which was emailed on March 2, 2009.  The letter stated matter-of-factly that the Academic Advising Office already "prompts all instructors every three weeks to inform our office of any students experiencing academic difficulties."

overcome these concerns.  She said the College could not require professors to take attendance and that asking for feedback on class participation was too subjective.  More generally, she argued that answering D.L.'s Four Questions was not an academic accommodation but, rather, a personal service and/or a way to prevent or monitor her disorder.

71. The concerns seemed nonsensical.  Nevertheless, D.L.'s mother explained that her professors already graded her on the basis of attendance (an objective measure) and participation (a subjective measure).  She said D.L. did not intend to require anything more than the available information elicited in her Four Questions.  There was no requirement that professors do anything which they did not do already.  She asserted the questions could not be considered a personal service because they were expressly about D.L. academic progress.

72. As for the concern that Four Questions were to be used to prevent or monitor D.L.'s disorder, her mother wrote:  "To avoid misunderstandings, any statements or suggestions in D.L.'s correspondence that professor feedback is to be used for anything other than to track her academic progress in order to help her devise ways to overcome her disability's interference with her education are to be ignored.  D.L. may have inadvertently suggested otherwise. . . ."

73. D.L.'s mother viewed these concerns as unsupported.  Moreover, Stern's re-working of D.L. did not assure that Grinnell would employ an effective communication process by which to provide D.L. meaningful academic progress.

74. Still, D.L.'s mother could be sure discussions had reached an impasse.  The letter extended an invitation for "your cooperation in crafting and implementing" D.L.'s reasonable accommodations.

75. D.L.'s mother promptly replied the next day on March 3, 2009 with two stripped-down options and asked:  "Will the College provide, as an academic adjustment, one of the two plans described in the Attachment?  Presently, a simple 'yes' or 'no' is all that is required."

76. On March 12, 2009, Stern finally, unequivocally and unambiguously rejected the accommodation, stating that the law did not require professors to answer questions like D.L.'s in writing.

### V. Grinnell Reproaches D.L.'s Failings; Retaliates with Hostile Learning Environment

### A.  Grinnell Intimidates D.L. with Endless Comparisons to the Grinnell Model Student

77.  Throughout her dealings with D.L., Stern insisted that Grinnell students are admitted with the clear understanding that they are capable of managing their own academic progress without help from others.

78.  Her remarks left no doubt in D.L.'s mind that a student who cannot advocate for herself and requires help communicating and interacting with faculty does not make the grade.

79.  Conversations with D.L. made this clear.  Written communications indicate the same. On December 19, 2008, two days after her emergency medical leave commenced, D.L. asked her father to inquire about accruing transfer credits during her leave.  He called Stern and left word. Stern answered D.L. directly in order to caution her against allowing others to do things for her or make decisions for her.  "You need to be working to learn to steer your own ship."

80.  On January 15, 2009, when Stern answered D.L.'s re-admission request, Stern wrote that "it's you who needs to be your best advocate."  She observed "there is an idea that borders on ironic in your plan."  Though D.L.'s therapists had recommended the plan, Stern importuned that the plan was a slippery slope.  It could deteriorate into a mere substitute for her parents.  Stern returned to the theme that D.L. had to learn to steer her own ship.

81.  In a letter dated February 27, 2009,[5]  Stern defied D.L.'s therapists, stating that D.L. – and no one else – should be directly involved in asking her Four Questions.  But worse, "[w]e think it makes most sense for D.L. to follow-up on her inquiries and to disseminate the information as she

---

[5] The letter was actually sent on March 2, 2009 as an email attachment.

has proposed." The notion that D.L. would be forced to badger professors for their answers terrorized her.

82. Dismissing her mother as well, Stern stated, "We do not see a need for Eileen to be involved in this process . . . ."

**B. Grinnell Overloads D.L. with Dubious Helpful Communications**

83. D.L.'s Four Questions were designed to allow D.L. to receive information without the dissonance of multiple interactions with faculty and administrators. Her therapists made this amply clear; yet, Grinnell set out to have five professors and administrators barrage D.L. with meetings and emails to show her what she was doing wrong.

84. Stern and Glenn Odom, D.L.'s Greek classic professor, were particularly aggressive. Stern was twice told not to communicate with D.L. and refused to honor the requests.

85. In a fifteen-day period alone, Odom engaged in a series of eleven email exchanges with D.L., together with additional face-to-face meetings. All this occurred as D.L. was telling Odom, and her mother was telling Stern, that illness and doctor visits were eating away at her capacity to absorb information and manage herself as a student.

86. In one email chain, Odom tells D.L. that he had not heard from the Health Center whether she was ill. D.L. answers that she missed getting to the Health Center before it closed but had arranged a doctor's visit for the next day. Odom warmly answers, "Why don't you email me when you are again healthy and we can schedule a meeting at that point. As for the paper, get it in as soon as possible with regards to your health." But, fourteen hours later, he lambastes her. He says he still has no word from the Health Center and demands that a draft of a paper to be turned in on March 5 was to be submitted immediately. Their face-to-face meetings followed a similar pattern. Odom's on-and-off behavior was dizzying.

### *VI. Grinnell's Infliction of Emotional Distress*

**A. D.L. Becomes Progressively Vulnerable**

87. In the middle of these emails, Odom writes D.L. on Monday, March 2, 2009, that he is keeping Stern informed of his dealings with her.  On the preceding Friday, February 27, 2009, Stern confirmed that Odom kept her abreast of developments through Katie Lau, a staff member.

88. Stern also volunteered that she was aware D.L. had been ill and had seen a doctor.

89. On March 2, 2009, D.L.'s mother followed up on Stern's email.  She wrote to convey her observations about D.L.'s worsening terror, withdrawal and uncommunicativeness with Odom.  She was anxious that Grinnell's insistence on having an array of people communicating its criticisms to D.L. was shutting her down.  This would not help.  Indeed, she warned it could cause her great injury.

90. She warned the College of D.L.'s precarious state.

> Presently, she's **terrified** that she won't be able to surmount her **paralysis in Prof. Odom's class** and that this will spill over into her other classes.  She admits that she has a fear of repeating last semester . . . .  She's now noticing that her sleep is off.  **These stresses are a perfect mix for triggering a bipolar episode**.

**B. Grinnell Professor Unleashes Outrageous Unprovoked Attack**

91. Four days later, on March 6, 2009, Odom unleashed an unprovoked attack on D.L. because she was uncommunicative.

> After speaking to you at great lengths about your responsibility as a student and making a number of suggestions of how you might wish to conduct yourself in order to further your academic success, this lack of contact from you, **regardless of illness**, is inexcusable. . . . I am not open to negotiation on this matter. . . . I do not see a need for us to meet again about this.  It might be wise, on your part, to focus on whichever of your classes you may still be able to pass.

92. Odom had already scolded her several times for her uncommunicativeness.  He knew details of her condition and its effects; she gave him a copy of her accommodation request.  This

time he raised the stakes to a sinister level.  Using his knowledge of her impairment to exploit her vulnerability, he scorned her illness – a condition beyond her control – and its effects – difficulty communicating and interacting with people in authority, particularly professors.  This last straw spawned a torrent.

## C.  D.L.'s Injuries Cascade Out of Control

93. It began when D.L. experienced a sudden, painful migraine headache within an hour or so of Odom's email that Friday afternoon.  Nausea, vomiting and sleeplessness followed. Friday afternoon and evening merged into the weekend unnoticed.  More migraines and recurring fits of nausea, vomiting, sleeplessness and decreased appetite kept her in her room throughout that weekend.  She managed to get to the dining hall once or twice only.

94. She resorted to Maxalt.  Her pediatric neurologist had prescribed it to relieve her migraine's debilitating symptoms, including nausea.  She had told Stern about her migraines in her January 13, 2009 plan for her return to campus.  Much earlier, she disclosed her migraines in order to receive, as an accommodation, a quiet and dark room away from the din of party dorms.

95. She called her parents.  They hustled to catch flights to Iowa.

96. Monday gave her some focus.  She had to go to class.  This held out the promise that the repercussions would subside.  She tried to see her Iowa therapist, but no appointment was available on short notice.  But, at least, her parents were arriving.   She was lodged at their motel. She took her parents' counsel to pause and email Odom for clemency. By the afternoon, they ordered her to rest in the manner her neurologist prescribed to enable Maxalt to surmount an emerging migraine – curtains closed; lights out; no TV, computer, games, or phone.  Sometime in the wee hours of Wednesday, March 11, 2009, she interrupted her forced rest and wrote disturbingly lucid, manic messages to professors and Posse, a foreboding sign.

97. She wrote Posse (punctuation included):

> Grinnell's got to stop throwing information at me when they know this plays to my confusion, etc. . . . saying, "Here! Let me give you information about your academic progress."   "What?   We gave you all this helpful information and you're still a screw up?!"   "See, we told you, you shouldn't have come back." . . . . Shame on them!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!

98. She finally saw her Iowa therapist on Friday, March 13, 2009.  Back at home on Monday, March 16, 2009, she promptly arranged to see her Maryland psychotherapist and psychiatrist.  Her psychotherapist required that she return the following week for two more sessions to stabilize her before flying back to Iowa to resume studies after Spring Break.

99. On Thursday of the previous week, March 12, 2009, D.L. and her parents met with Stern.  They asked for an explanation for Odom's conduct.  They noted Stern had been forewarned about D.L.'s brewing emotional storm and Odom's volatile state.  Stern said she knew about the March 6 incident. She said did not consider it of any great moment.  It was at best benign; Odom's written rants did not register with her as an aggravating factor.  And, as if to prove it, she turned to D.L. to glibly remark that sure looked good a week after the incident.  As if on cue, she offered D.L. the option of withdrawing from the course.

100.    Stern's language and demeanor left no doubt that about Grinnell's discriminatory attitudes.  These were telltale signs which emails and phone calls masked.  Her parents counseled D.L. to withdraw from the school altogether.  D.L. would not agree.  She only withdrew from Odom's course.

101.    Against this backdrop, Marcy Mistrett, Posse's D.C. Director, tried to counsel and mediate what was in D.L.'s best interest.  She wanted the ADA/504 accommodations or a reasonable approximation to be implemented.  She was frustrated that Grinnell's Academic Difficulty Report system was inadequate.  She tried to help by following through on Posse's commitment to D.L., to give her a mentor who actually helped her track her academic progress.

Mistrett dropped the matter when her own efforts went unrewarded.  On information and belief, this was because Grinnell would not allow Posse to help D.L. as agreed.

102.    Remarkably, D.L. returned two weeks later after Spring break.  She finished her remaining courses with grades of "B."  D.L. complied with her Posse obligations until the end of the semester.  Stern was instructed not to contact D.L.

103.    At the start of summer, D.L. acceded to her mother's entreaties that she take a one-year non-medical personal leave of absence from Grinnell.  She agreed on condition that her parents support her attendance over the summer and throughout the following academic year at Montgomery College in Rockville, Maryland.

104.    She adapted the January 26, 2009 accommodation request she submitted to Grinnell.  She used it to apply for accommodations at Montgomery College.  All her requests were implemented without modification or question.  This would repeat itself at her present small liberal arts college.

105.    To experience that two colleges had no qualms about her accommodation requests was an eye-opener.  The experience began her healing process.  D.L. stopped blaming herself for her disability.  She cast off the shame of having to ask for accommodations.  In time, she set aside her blind loyalty to Grinnell and conceded it was irresponsible to return to Grinnell.   She never did.  She could not knowingly put herself in harm's way.

## FIRST CAUSE OF ACTION
### Section 504 - Discrimination on Basis of Disability
### (29 U.S.C.A. § 794)

106.    D.L. adopts paragraphs one through one hundred five by reference.

107.    D.L. is and was a qualified individual with a disability under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.A. § 794.

108.     Grinnell is a recipient of federal funds which support its sundry educational activities.

109.     D.L. is and was able to meet all of Grinnell's academic requirements in spite of her disability.

110.     D.L. requested that Grinnell modify policies, practices and procedures unrelated to academic requirements which had the effect of limiting her participation the College's educational programs or activities.

111.     D.L. requested that Grinnell modify academic requirements that were not essential to the educational programs and activities she pursued as a college student.

112.     D.L. requested that Grinnell professors and administrators use effective means of communicating with her professors that would enable her to process information about her academic progress on an equal footing with unimpaired students.

113.     Grinnell rejected D.L.'s requests.

114.     The requested modifications and accommodations had an identifiable relationship to her disability.

115.     Grinnell did not afford D.L. an equal opportunity to gain the same benefits others received in the most integrated setting appropriate to her needs.

116.     Grinnell retaliated against D.L. for invoking her entitlement to the benefits and services available to others.

117.     She was, solely because of her disability, coerced, intimidated, harassed and ground down into engaging with faculty and administrators against her express wishes and/or limiting the benefits, services and advantages to which she was entitled.

118.     D.L. was the recipient of disparate treatment.

119.     Grinnell created a hostile learning environment.

120.     Grinnell acted in bad faith during informal, interactive discussions.

121.     Grinnell had actual or constructive knowledge of the actions of its faculty and administrators.

122.     Grinnell did not take reasonable care to prevent or correct the discriminatory conduct of its agents.

123.     The relationship between Grinnell and D.L. is irreparable and beyond effective equitable injunctive relief.

124.     Grinnell, solely on the basis of her disability and with invidious animus, intentionally discriminated against D.L. or acted in reckless disregard that its actions discriminated against her.

125.     Grinnell acted with deliberate indifference and in bad faith with respect to D.L.'s rights as an individual with a disability.

WHEREFORE, D.L. asks this Court for the following relief under her First Cause of Action for discrimination on the basis of a disability under 29 U.S.C.A. § 794:

A.  An award of compensatory damages of Four Hundred Thousand Dollars ($400,000.00) for deprivation of her civil rights and special damages of Twenty Thousand Dollars ($20,000.00) for foreseeable out-of-pocket expenses.

B.  Alternatively, an award of equitable damages in the amount of One Hundred Sixty Thousand Dollars ($160,000.00);

C.  An award of exemplary damages of Five Hundred Thousand Dollars ($500,000.00) to deter Grinnell and similarly situated colleges and universities from using oppressive, arbitrary and vindictive discriminatory acts against otherwise qualified students with a mental disability in order to intimidate or quash the exercise of their right to *de minimis* reasonable accommodations;

D.  An award of attorney's fees; and

E.  Such other relief as is just and proper.

## SECOND CAUSE OF ACTION
### Breach of Re-Admission Contract

126.     D.L. adopts paragraphs one through one hundred five by reference.

127.     D.L. entered into a contract at the time of her re-admission ("Re-Admission Contract").

128.     The contract included Grinnell's promise that it would partner with D.L. and support her plan, which she was to implement herself.

129.     Grinnell breached its promise and its implied covenant of good faith and fair dealing in the performance of its promise.

130.     D.L. satisfied her conditions in the Re-Admission Contract.

WHEREFORE, D.L. asks this Court for the following relief under her Second Cause of Action for Breach of Re-Admission Contract:

A.  An award of expectation damages of Four Hundred Thousand Dollars ($400,000.00) for the loss of her bargain and consequential damages of Twenty Thousand Dollars ($20,000.00) for foreseeable out-of-pocket expenses; and

B.  Such other relief as is just and proper.

## THIRD CAUSE OF ACTION
### Promissory Estoppel

131.     D.L. adopts paragraphs one through one hundred five by reference.

132.     Grinnell made a clear and definite promise to support and partner with D.L.

133.     The promise was made clearly knowing that D.L. sought to determine if the College supported or opposed her plan.

134.     D.L. justifiably relied on Grinnell's promise and acted to her substantial detriment.

135.     Grinnell did not uphold its promise.

136.     Justice can be avoided only by enforcing the promise.

WHEREFORE, D.L. asks this Court for the following relief under her Third Cause of Action for Breach of Re-Admission Contract:

A.  An award of expectation damages of Four Hundred Thousand Dollars ($400,000.00) for the loss of her bargain and consequential damages of Twenty Thousand Dollars ($20,000.00) for foreseeable out-of-pocket expenses; and

B.  Such other relief as is just and proper.


## FOURTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

137.     D.L. adopts paragraphs one through one hundred five by reference.

138.     Grinnell owed D.L. a duty to avoid causing her emotional harm.

139.     Grinnell knew or should have known D.L. was especially susceptible to the risk that outrageous conduct would cause her emotional distress.

140.     Grinnell breached its duty.

141.     Grinnell acted intentionally to cause, or in reckless disregard of the probability of causing, D.L. emotional distress.

142.     Its actions were outrageous.

143.     D.L. suffered severe or extreme emotional distress.

144.     D.L's emotional distress was the actual and proximate result of this outrageous conduct.

WHEREFORE, D.L. asks this Court for the following relief under her Fourth Cause of Action for Intentional Infliction of Emotional Distress:

A.  An award of compensatory damages of Three Hundred Fifty Thousand Dollars ($350,000.00) for emotional distress and special damages of Twenty Thousand Dollars ($20,000.00) for incidental out-of-pocket expenses;

B.  An award of exemplary damages of Five Hundred Thousand Dollars ($500,000.00) to deter Grinnell and similarly situated colleges and universities from repeating such oppressive, arbitrary and disproportionately vindictive wrongful acts against students with a mental disability in similar vulnerable circumstances;

C.  An award of attorney's fees; and

D.  Such other relief as is just and proper.

## FIFTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress Based on Special Relationship

145.     D.L. adopts paragraphs one through one hundred five by reference.

146.     The College imposed its policies, practices and procedures as part of its contractual relationship with students and insisted on having faculty and administrators interact with D.L. directly while her accommodation request was under consideration.

147.     D.L., through her mother, told Grinnell she did not want these interactions with faculty and administrators pending ADA/504 modifications because such interactions, if not handled properly, could evoke deep emotional responses.

148.     Because Grinnell enforced its contractual relationship with D.L. in such delicate circumstances, the nature of the relationship imposed on Grinnell a duty of care to avoid causing D.L. emotional harm.

149.     Grinnell negligently breached its duty.

150.    Grinnell's breach proximately caused D.L. emotional distress.

WHEREFORE, D.L. asks this Court for the following relief under her Fifth Cause of Action for Negligent Infliction of Emotional Distress Based on a Special Relationship:

A. An award of compensatory damages of Three Hundred Fifty Thousand Dollars ($350,000.00) for emotional distress and special damages of Twenty Thousand Dollars ($20,000.00) for incidental out-of-pocket expenses; and

B. Such other relief as is just and proper.

## SIXTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

151.    D.L. adopts paragraphs one through one hundred five by reference.

152.    Grinnell had an ordinary duty of care to avoid causing D.L. emotional harm.

153.    Grinnell negligently breached its duty at a time when it knew or should have known D.L. was most vulnerable to emotional distress.

154.    Its breach proximately caused D.L. emotional distress and physical injury.

WHEREFORE, D.L. asks this Court for the following relief under her Sixth Cause of Action for Negligent Infliction of Emotional Distress:

A. An award of compensatory damages of Three Hundred Fifty Thousand Dollars ($350,000.00) for emotional distress and physical injury and of special damages of Twenty Thousand Dollars ($20,000.00) for incidental out-of-pocket expenses; and

B. Such other relief as is just and proper.

## SEVENTH CAUSE OF ACTION
### Intentional Interference with Contract

155.    D.L. adopts paragraphs one through one hundred five by reference.

156.    D.L. had a contract with Posse.

157.    Grinnell interfered with D.L.'s contract with Posse by directing, encouraging, intimidating or persuading the mentor not to agree to take D.L.'s proposed academic progress reports.

158.    Grinnell's conduct was intentional or in reckless disregard of D.L. contractual interests.

159.    Grinnell's interference proximately caused D.L. to sustain damages to her contractual interests.

WHEREFORE, D.L. asks this Court for the following relief under her Seventh Cause of Action for Intentional Interference with Contract:

A.  An award of compensatory damages of Four Hundred Thousand Dollars ($400,000.00) and special damages of Twenty Thousand Dollars ($20,000.00) for foreseeable out-of-pocket expenses.

B.  An award of exemplary damages of Five Hundred Thousand Dollars ($500,000.00).

C.  An award of attorney's fees; and

D.  Such other relief as is just and proper.

Respectfully submitted,


 /s/
Enrique Santos, Esq.
DC Bar 471087
842-B Rockville Pike #511
Rockville, MD  20852
240-888-8047
240-465-0698  Fax
esantos@comcast.net